# CV 1 5        4472

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEAN TED and BONNIE FOSTER PATRICK and MARK LAND and LORRIE ANN COATES, on behalf of themselves and all others similarly situated, | Civil Action No.: |
| *Plaintiffs,* | |
| v. | **CLASS ACTION COMPLAINT** |
| AMERICAN AIRLINES, INC., DELTA AIR LINES, INC., SOUTHWEST AIRLINES CO., and UNITED AIRLINES, INC. | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

*DEARIE, J.*

*POLLAK, M.J.*

1.      Dean Ted and Bonnie Foster Patrick and Mark Land and Lorrie Ann Coates ("Plaintiffs"), on behalf of themselves and all others similarly situated, by counsel, bring this class action against Defendants for claims arising under the federal antitrust laws. Plaintiffs' allegations against Defendants are based on personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to other matters.

## NATURE OF CLAIM

2.      American Airlines, Delta Air Lines, Southwest Airlines, and United Airlines (collectively, "Defendants") are the four largest commercial airlines in the United States.

3.      As a result of consolidation in the airline industry, Defendants account for about 85% of air passenger traffic in the United States since 2013.

4.      While consolidation of the airline industry has lined the pocketbooks of Defendants, competition has suffered and consumers have paid the price with higher fares, numerous fees, and reduced service.

{00703626.1 }

5.      Defendants have taken advantage of increased consolidation and market concentration by agreeing to exercise "capacity discipline," which in industry parlance means limiting the supply of flights and seats. As a result of capacity discipline, Defendants were able to impose higher fares and reduce service, which resulted in record profits for Defendants.

6.      Defendants' price-fixing agreement to reduce or maintain capacity started at least as early as 2007, when they faced high fuel prices and a worldwide recession that weakened demand for air passenger transportation services.

7.      Whereas in past recessions and periods of high fuel prices, Defendants continued to aggressively compete for market share, starting in 2007 they agreed to a scheme to reduce competition among themselves. This price-fixing conspiracy involved reducing and maintaining capacity discipline, which, when done collectively, would reap substantial benefits to them all.

8.      Defendants reached their unlawful agreement through various meetings at industry conferences, participation in Wall Street earnings calls, and by other means.

9.      As a result of their unlawful conspiracy, Defendants succeeded in raising prices for air passenger transportation services in the United States, causing injury to Plaintiffs and the Class who paid higher prices for air passenger transportation services than they would have paid in the absence of Defendants' illegal price-fixing conduct.

10.     Plaintiffs bring this action for claims arising under the federal antitrust laws to recover damages, injunctive relief, and other relief for the substantial injuries it and others similarly situated have sustained as a result of Defendants' unlawful conduct to restrain competition in the market for air passenger transportation services in the United States from at least as early as January 1, 2007 to the present (the "Class Period").

## JURISDICTION AND VENUE

11.     This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

12.     This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15a and 26) and pursuant to 28 U.S.C. §§ 1331 and 1337(a).

13.     Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15a, 22 and 26, and 28 U.S.C. §§ 1391 (b), (c), and (d), because during the Class Period, one or more of Defendants resided, transacted business, had agents, or were found in this District; a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

14.     This Court has personal jurisdiction over each Defendant because each, either directly or through the ownership and/or control of its subsidiaries: (a) transacted business throughout the United States, including in this District; (b) directly sold or marketed air passenger transportation services throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; and/or (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District. In addition, the illegal price-fixing conspiracy was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.

## THE PARTIES

15.     Plaintiffs, who are residents of Richmond, Virginia, purchased numerous plane tickets directly from one or more of Defendants during the Class Period, and have been injured in their business or property by reason of Defendants' violations of law as alleged herein.

16.     Defendant American Airlines, Inc. ("American") is a Delaware corporation with its headquarters located at 4333 Amon Carter Boulevard, Fort Worth, Texas. It is a subsidiary of American Airlines Group Inc., also a Delaware Corporation with its headquarters located in Fort Worth, Texas. American provides air passenger transportation services throughout the United States, including flights to and from this District. American operates a hub at John F. Kennedy International Airport ("JFK") in New York City, which is located in this District.

17.     Defendant Delta Air Lines, Inc. ("Delta") is a Delaware corporation with its headquarters located at 1030 Delta Boulevard, Atlanta, Georgia. Delta provides air passenger transportation services throughout the United States, including flights to and from this District. Delta operates a hub at JFK in New York City, which is located in this District.

18.     Defendant Southwest Airlines Co. ("Southwest") is a Texas corporation with its headquarters located at 2702 Love Field Drive, Dallas. Southwest provides air passenger transportation services throughout the United States, including flights to and from this District.

19.     Defendant United Airlines, Inc. ("United") is an Illinois corporation with its headquarters located at 233 S. Wacker Drive, Chicago, Illinois. It is a wholly-owned subsidiary of United Continental Holdings, Inc., a Delaware corporation. United provides air passenger transportation services throughout the United States, including flights to and from this District.

## AGENTS AND UNNAMED CO-CONSPIRATORS

20.     At all relevant times, other airlines, entities, or persons, including, but not limited to, AirTran Airways (prior to its merger with Southwest), U.S. Airways (prior to its merger with American), Continental Airlines (prior to its merger with United), and Northwest Airlines (prior to its merger with Delta), conspired with Defendants in their unlawful restraint of trade.

21.     Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

22.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

23.     In this Complaint, whenever reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

### Background

24.     The passenger airline industry is primarily composed of three types of airlines: (i) legacy (or network), (ii) low-cost, and (iii) regional.

25.     Legacy airlines were in operation before the Airline Deregulation Act of 1978 and support large, complex hub-and-spoke operations with thousands of employees and hundreds

of aircraft. These airlines provide service at various fare levels to a wide variety of domestic and international destinations. Today, the legacy airlines are Delta, American, and United.

26.     Low-cost airlines generally entered the market after deregulation and tend to operate less costly point-to-point service using fewer types of aircraft. Southwest entered the passenger airline industry as a low-cost airline.

27.     Regional airlines operate smaller aircraft—turboprops or regional jets with up to 100 seats—and generally provide service to smaller communities under capacity purchase agreements with legacy airlines. Some regional airlines are owned by a legacy airline, while others are independent.

28.     The passenger airline industry has experienced considerable merger and acquisition activity, especially following deregulation in 1978. For example, Delta acquired Northwest in 2008, United and Continental merged in 2010, Southwest acquired AirTran in 2011, and U.S. Airways and American merged in 2013.

29.     As a result of airline consolidation, Defendants American, Delta, Southwest, and United are now the four largest surviving domestic airlines based on the number of passengers served. These four airlines account for approximately 85 percent of passenger traffic in the United States in 2013.

30.     The following figure provides a timeline of Defendants' mergers and acquisitions:



Sources: Cathay Financial and airline company documents.

31.     While consolidation may have strengthened the financial health of Defendants, competition has suffered as a result. Indeed, as noted by the Department of Justice ("DOJ") in its complaint challenging the U.S. Airways-American merger, "[i]n recent years . . . the major airlines have, in tandem, raised fares, imposed new and higher fees, and reduced service. Competition has diminished and consumers have paid a heavy price."[1] "With less competition," the DOJ alleged, "airlines can cut service and raise prices with less fear of competitive responses from rivals."[2]

32.     Professor Christopher Sagers similarly noted in his statement before Congress opposing the U.S. Airways-American merger: "[t]he legacy carriers have remained high cost, but through well protected pockets of market power and anticompetitive conduct they have been able to acquire or exclude almost all of the many low-cost carrier entrants ("LCCs") that have challenged them since deregulation."[3]

---

[1] Am. Compl. at ¶ 1, *United States v. U.S. Airways Group, Inc.*, No. 13-cv-1236 (D.D.C. Sept. 5, 2013).

[2] *Id.* at ¶ 2.

[3] Statement of Christopher L. Sagers Before the Subcommittee on Regulatory Reform, Commercial and Antitrust Law of the Committee on the Judiciary, United States House of

33.     LCCs offer only limited competitive restraints to Defendants' pricing and supply decisions because they have less extensive networks and generally do not offer the kind of access to the lucrative business-oriented markets that Defendants provide.

34.     As a result of the recent wave of mergers, "[w]e are unquestionably living with an air travel oligopoly," wrote Vinay Bhaskara, an industry analyst, in a 2014 article for Airways News.

**Capacity Discipline**

35.     In the 2007-2008 timeframe, Defendants here were faced with sky-high fuel costs and a global recession that weakened demand for air passenger transportation services in the United States.

36.     In the face of past weakened demand for their services, Defendants continued to vigorously compete for the provision of such services to consumers, including by lowering airfares.

37.     During 2007 and 2008, however, Defendants decided to do things differently. Instead of competing, they agreed to collectively exercise "capacity discipline." This refers to restraining growth by limiting flights and seats. This tactic ensured higher fares, reduced service to consumers, and bigger profit margins for Defendants.

38.     Defendants' unlawful price-fixing agreement though capacity discipline involved the reduction or maintenance of air passenger capacity throughout the Class Period.

39.     Consolidation in the industry made it easier for Defendants to agree to capacity discipline. DOJ's August 2013 lawsuit filed to block the merger of American and U.S. Airways

---

Representatives, Concerning "Competition and Bankruptcy in the Airline Industry: The Proposed Merger of American Airlines and U.S. Airways, Feb. 26, 2013.

pointed out that each significant legacy airline merger in recent years has been followed by substantial reductions in capacity. According to the DOJ, "[t]hese capacity reductions have not consisted simply of cancellation of empty planes or empty seats; rather, when airlines have cut capacity after a merger, the number of passengers they carry on the affected routes has also decreased."[4]

40.    Defendants reached their unlawful price-fixing agreement through meetings at airline industry conferences, participation in Wall Street earnings calls with financial analysts, and by other means.

41.    Indeed, Defendants recognized that engaging in capacity discipline was a key mechanism by which they could raise airfares and increase their profits.

42.    For example, in a 2008 earnings call, Robert Fornaro, CEO of Airtran, which was acquired by Defendant Southwest, stated: "The strongest comp correlation at the end of the day is capacity and pricing. Just raising prices without reduction in capacity is not going to raise the average fare. In order to support the price increases, the capacity has to drop."[5]

43.    Fornaro confirmed the importance of capacity discipline in 2010: "We think there are growth opportunities, and we think we can participate in those growth opportunities, but also, ultimately, we think discipline is important."[6]

44.    In 2009, Jeff Smisek, then CEO of Continental prior to its merger with United, stated: "At Continental, we have seen the benefits from and understand the importance of

---

[4] Am. Compl. at ¶ 60, *United States v. U.S. Airways Group, Inc.*, No. 13-cv-1236 (D.D.C. Sept. 5, 2013).

[5] Airtran Q1 Earnings call 2008.

[6] Jay Boehmer, *2010 Business Travel Survey: Carriers Continue to Make The Most Of Capacity Control*, Business Travel News, July 14, 2010, http://www.businesstravelnews.com/Business-Travel/Airline-News/Articles/2010-Business-Travel-Survey--Carriers-Continue-To-Make-The-Most-Of-Capacity-Control/.

capacity discipline. We have a bias towards capacity discipline, because we are firmly committed to achieving and sustaining profitability."[7]

45.   In 2010, Smisek reiterated that his airline was "focused on capacity discipline. . . . We want to make money."[8]

46.   Kathryn Mikell, United's CFO, similarly stated in 2010 that "[c]apacity discipline is clearly key to improving the economics of our business."[9]

47.   During a 2011 interview with Fortune Magazine, Smisek again confirmed the importance of capacity discipline post-merger with United:

> What we learned is the importance of capacity discipline. Ours has been an industry where it's very easy to add seats, through increased frequencies, flying the aircraft longer, or taking delivery of additional aircraft. In the recession we were very disciplined in getting our capacity down, and as we saw the recovery with high fuel prices, we've been very disciplined at United and across the industry in making sure we've got the right level of capacity and not supplying overcapacity, driving down pricing.[10]

48.   Smisek maintained this view even as the economy improved and in the face of record profits. He stated in 2015, "We're going to run the airline for profit maximization and we're very focused on capacity discipline . . . . We will absolutely not lose our capacity discipline."[11]

---

[7] Continental Q4 Earnings Call 2009.

[8] Lori Ranson, *US carriers keep a grip on capacity*, Flightglobal, May 20, 2010, http://www.flightglobal.com/news/articles/us-carriers-keep-a-grip-on-capacity-342235/.

[9] Kyle Peterson, *Analysis: Airlines charging more to fly on cramped planes*, Reuters, June 18, 2010, http://www.reuters.com/article/2010/06/18/us-airlines-loads-idUSTRE65H43020100618.

[10] Geoff Colvin, *Jeff Smisek: United Continental's King of the Skies*, Fortune, April 21, 2011, http://archive.fortune.com/2011/04/19/news/companies/jeff_smisek_united_continental.fortune/index.htm.

[11] Aaron Karp, *Maintaining Capacity Discipline*, Air Transport World, Jan. 28, 2015, http://atwonline.com/blog/maintaining-capacity-discipline.

55.     In 2009, Smisek again called for the industry to "cut capacity to match the demand and ultimately we all need higher yields than we are getting because of the yields that we are getting, the demand we are getting, most all carriers are losing money and clearly that is not sustainable."[16]

56.     U.S. Airways Chief Operating Officer, Robert Isom, stated before U.S. Airways' merger with American, that "[t]he *industry as a whole* in 2009 took out about 6 percent of capacity . . . . *We did our share with 4.5 percent.* As we look forward, we want to make sure that discipline is maintained going into 2010."[17] Indeed, in 2010, American's (then U.S. Airways) Scott Kirby reiterated that "[o]ne of the most important things that happened in *the industry is capacity discipline.*"[18]

57.     Delta's Glen W. Hauenstein similarly recognized in 2008 that Delta could not engage in capacity discipline "alone." He stated that Delta has to have capacity discipline "*in conjunction with the other carriers* because certainly there are capacity cuts that we can do on our own, while they will help us, they will not remedy the industry woes. So as we look forward, we're hopeful that the other carriers act responsibly and look at the demand profiles as we move into the fall. And I would say if the industry could achieve a 10 % reduction in capacity year over year by the fall that we'd be in pretty good shape given today's fuel environment."[19]

---

[16] Continental Q2 Earnings Call 2009.

[17] Jay Boehmer, *J.P. Morgan Notebook: Airline Share Plans for Capacity, Alliances, Revenue Growth*, Business Travel News, March 9, 2010,
http://www.businesstravelnews.com/article.aspx?id=13101&ida=Airlines&a=btn (emphasis added).

[18] Jay Boehmer, *2010 Business Travel Survey: Carriers Continue to Make The Most Of Capacity Control*, Business Travel News, July 14, 2010, http://www.businesstravelnews.com/Business-Travel/Airline-News/Articles/2010-Business-Travel-Survey--Carriers-Continue-To-Make-The-Most-Of-Capacity-Control/ (emphasis added).

[19] Delta Q1 Earnings Call 2008 (emphasis added).

49.     In 2010, Delta's CEO, Richard Anderson, confirmed that capacity discipline was profitable: "By the end of 2010, our fleet will be 91 aircraft smaller, but we will be able to generate essentially the same revenue for the year."[12]

50.     More recently, Anderson echoed Smisek's comments above by stating, "We are not making any changes to our 2015 capacity plan in light of the lower fuel prices. . . . In fact, we continue to trim capacity on the margin to maintain yields."[13]

51.     During an earnings call in 2008, American CEO Gerard Arpey spoke of American's capacity discipline as a mechanism to increase prices: "that's what's behind our capacity reductions is to get capacity to a level where our prices increases can stick."[14]

52.     Prior to the U.S. Airways-American merger, American had planned to expand domestically and internationally, adding additional flights and service on nearly 115 new routes. However, after the merger, the new American quashed that plan, choosing instead to continue exercising capacity discipline in agreement with its competitors.

53.     Defendants recognized that in order for capacity discipline to work, it must be collectively implemented industry-wide. The financial benefits to Defendants from capacity discipline could not be realized unless all Defendants agreed not to compete by offering lower fares and increased capacity.

54.     United's (then Continental's) Smisek stated in 2008 that "[o]ne thing that is different about this cycle compared to other economic cycles is that the *industry* including Continental has already cut a significant amount of capacity."[15]

---

[12] Delta Q2 Earnings Call 2010.

[13] Aaron Karp, *Maintaining Capacity Discipline*, Air Transport World, Jan. 28, 2015, http://atwonline.com/blog/maintaining-capacity-discipline.

[14] American Q2 Earnings Call 2008.

[15] Continental Q3 Earnings Call 2008 (emphasis added).

58.     Even as the economic climate improved, however, Defendants continued to maintain capacity discipline in order to keep airfare prices (and therefore profits) high.

59.     American's Arpey stated in 2010: "There are also hopeful signs that *the industry has learned its lesson* about keeping capacity growth in line with demand—*and will continue to apply that lesson* even as the economy comes back."[20]

60.     In 2010, Delta President Ed Bastian said that "[m]aintaining capacity restraint in the face of a recovering economy is at the core of improving our financial results."[21]

61.     Scott Kirby, U.S. Airways President, praised the industry in 2010 for its capacity discipline: "It's good to see the industry recognize we are in a mature industry. . . . *This isn't a growth industry anymore.*"[22]

62.     More recently, Southwest's CEO, President, and Chairman Gary Kelly stated on an earnings call that "[t]he economy, at least in our view, has been more consistent, more stable, driving more confidence and more consistent travel demand. That's showing up. *The industry is not adding a lot of capacity as well.* So supply demand obviously seems to be from an industry perspective and nice balance."[23] Indeed, Southwest hasn't "grown capacity since 2011."[24]

---

[20] David Jonas, *Airline Executives: This time will be different*, Global Travel Industry News, June 17, 2010, http://www.eturbonews.com/16791/airline-executives-time-will-be-different (emphasis added).

[21] Michael Fabey, *Airlines limit capacity despite strong Q2*, Travel Weekly, July 23, 2010, http://www.travelweekly.com/Travel-News/Airline-News/Airlines-limit-capacity-despite-strong-Q2/.

[22] Jay Boehmer, *2010 Business Travel Survey: Carriers Continue to Make The Most Of Capacity Control*, Business Travel News, July 14, 2010, http://www.businesstravelnews.com/Business-Travel/Airline-News/Articles/2010-Business-Travel-Survey--Carriers-Continue-To-Make-The-Most-Of-Capacity-Control/ (emphasis added).

[23] Southwest Q3 Earnings Call 2014 (emphasis added).

[24] Southwest Q4 Earnings Call 2015.

63.     American's CFO, Derek Kerr, echoed this strategy: "There has been a lot of talk of capacity changes in response to lower fuel price. You won't see any changes from us in the near future since we continue to run the airline as though high fuel prices will return."[25]

64.     While Defendants initially agreed to capacity discipline to ostensibly combat high fuel costs and weakened demand caused by the recession that began in 2008, over the last year, oil prices have dropped by more than 50 percent. In April 2015, U.S. airlines paid $1.94 per gallon, down 34 percent from the year before. Yet fares have not declined and seat capacity has not rebounded despite increased demand for air travel due to Defendants' continued agreement to capacity discipline.

65.     As seen in the below chart, although jet fuel prices have significantly declined over the last four years, the average price of domestic airfares has actually *increased*:

---

[25] American Q4 Earnings Call 2014.



66.    Since 2007, airline seat capacity has been reduced or maintained through Defendants' unlawful agreement. The chart below graphically depicts legacy airline capacity using available seat miles, a commonly-used metric in the airline industry to measure capacity:[26]

---

[26] Data compiled from the U.S. Department of Transportation's ("DOT") Bureau of Transportation Statistics.



67. The industry has also recently earned record profits. In the past two years, U.S. airlines earned a combined $19.7 billion in revenue. The International Air Transport Association ("IATA"), an international trade body representing of 240 domestic and international airlines, projected that North American airline industry net after-tax profits would more than double this year to over $13 billion, a record. That projection, however, was based on an average cost of $85 a barrel for Brent crude oil. Today, the price is about $55 a barrel, so profits are likely even higher.

68. In the absence of collusion, in a competitive market, airlines would add capacity to popular routes where they saw the opportunity to capture business from a competitor. And given low oil prices, one would expect that at least one airline would lower its prices to pick up market share and make up the per ticket dollar decline in volume. At the very least, cost savings in the form of lower airfares due to decreased jet fuel costs should occur. However, due to Defendants' anticompetitive behavior, that has not happened. As long as the agreement to reduce

or maintain capacity across the industry continues, there's no incentive for airlines to reduce fares, no matter how low fuel prices or other costs go.

69.    As DOJ predicted in its complaint against the U.S. Airways-American merger: "Coordination becomes easier as the number of major airlines dwindles and their business models converge. If not stopped, the merger would likely substantially enhance the ability of the industry to coordinate on fares, ancillary fees, and service reductions."[27] A prescient statement from DOJ, as this is exactly what has happened. In the face of an improving economy and stronger demand, rather than competing for market share by increasing capacity, Defendants have continued their agreement to reduce or maintain capacity, thus ensuring continued higher prices by reducing competition among them, as well as significant profits to Defendants.

70.    Yale Professor of economics and former deputy attorney general in the antitrust division of the DOJ Dr. Fiona Scott Morton stated "that only since the recent wave of consolidation among airlines have they been able to set prices significantly above marginal cost. "That's great for the industry but not for consumers," she said.

**International Air Transport Association Meeting**

71.    In May 2015, Southwest's CEO, Gary C. Kelly, announced that the airline, whose image is closely tied to discount fares, was going to expand capacity in 2015 by as much as eight percent, with the expansion spilling over into 2016.

72.    But Southwest's competitor airlines did not want Southwest to break rank on their agreement for capacity discipline. At the IATA annual meeting in Miami, Florida, which took place from June 7-9, 2015, Southwest came under fire for its announcement.

---

[27] Am. Compl. at ¶ 46, *United States v. U.S. Airways Group, Inc.*, No. 13-cv-1236 (D.D.C. Sept. 5, 2013).

73.     At the meeting, several Defendants spoke publicly about the continued need for discipline within the industry, reinforcing their commitment to the collusive price-fixing agreement through industry-wide capacity reduction and maintenance.

74.     Delta's Bastian stated that Delta was "continuing with the discipline that the market place is expecting."

75.     American's CEO, Doug Parker, stated that the airlines had learned their lessons from past price wars: "I think everybody in the industry understands that," he told Reuters.

76.     Air Canada's chief executive, Calin Rovinescu, echoed these sentiments, saying "People were undisciplined in the past, but they will be more disciplined this time."

77.     "Discipline," as *New York Times* reporter James B. Stewart stated, is classic oligopoly-speak for limiting flights and seats, charging higher prices and reaping bigger profit margins.

78.     Dr. Scott Morton concurs: "When airline industry leaders say they're going to be 'disciplined,' they mean they don't want anyone to expand capacity." "And when there aren't enough seats, airlines raise prices. That's what we've been seeing."[28]

79.     The pressure from Defendants and other airlines worked: Southwest quickly moved to reassure investors it was not going rogue. "We have taken steps this week to begin pulling down our second half 2015 to manage our 2015 capacity growth, year-over-year, to approximately 7 percent," Mr. Kelly stated.

80.     The 2015 annual IATA meeting is an example of Defendants' use of an industry conference to monitor and reaffirm their agreement on capacity discipline.

---

[28] James B. Stewart, *'Discipline' for Airlines, Pain for Fliers*, NY Times, June 11, 2015, http://www.nytimes.com/2015/06/12/business/airline-discipline-could-be-costly-for-passengers.html?_r=0.

**U.S. Senators' Call for Investigation**

81.     Defendants' conduct has also caught the eye of members of Congress.

82.     In a December 2014 statement, U.S. Senator Charles Schumer (D-N.Y.) called for a federal investigation of U.S. airlines amid falling gas prices.

83.     Senator Schumer stated, "At a time when the cost of fuel is plummeting and profits are rising, it is curious and confounding that ticket prices are sky-high and defying economic gravity. .... So I'm urging the feds to step in and do a price investigation on behalf of consumers who must buy holiday travel tickets that can break the bank. The industry often raises prices in a flash when oil prices spike, yet they appear not to be adjusting for the historic decline in the cost of fuel; ticket prices should not shoot up like a rocket and come down like a feather. That is why I urge the DOJ and DOT to immediately investigate why airline profits are not more efficiently being passed down to consumers."[29]

84.     On June 17, 2015, U.S. Senator Richard Blumenthal (D-Conn.) also asked the DOJ to immediately investigate collusion and anticompetitive behavior amongst U.S. airline companies following the IATA annual conference in Miami.

85.     In his letter to Assistant Attorney General William Baer, Blumenthal cited the DOJ's investigation into the merger of American and U.S. Airways and the DOJ's initial complaint, which stated: "The structure of the airline industry is already conducive to coordinated behavior ... the legacy airlines closely watch the pricing moves of their competitors.

---

[29] Statement by U.S. Senator Charles E. Schumer, Dec. 14, 2014,
http://www.schumer.senate.gov/newsroom/press-releases/schumer-as-fuel-costs-plummet-airfares-for-nyers-this-holiday-season-remain-extremely-high_calls-for-federal-investigation-into-why-dramatically-lower-fuel-costs-and-record-airline-profits-are-not-being-passed-on-to-consumers-through-lower-fares.

When one airline 'leads' a price increase, other airlines frequently respond by following with price increases of their own."[30]

86.     Senator Blumenthal further stated:

As you know from the Department of Justice's (DOJ's) investigation into US Airways' merger with American Airlines in 2013, *most airlines have traditionally viewed capacity reductions as a highly valuable way to artificially raise fares and boost profit margins*. In light of the recent unprecedented level of consolidation in the airline industry, this public display of strategic coordination is highly troubling.

Therefore, I urge the Justice Department to investigate this apparent anti-competitive conduct potentially reflecting a misuse of market power, and excessive consolidation in the airline industry. DOJ itself played a part in this consolidation by approving several mergers and now consumers are paying sky-high fares as airlines engage in market conduct designed to keep capacity artificially low.

Delta Air Lines' President was quoted at the IATA conference stating that, "(Delta is) continuing with the discipline that the marketplace is expecting." Air Canada's CEO made a parallel comment: "People were undisciplined in the past, but they will be more disciplined this time." Finally, American Airlines' CEO remarked that airlines had learned their lesson from past price wars set off by competition and that, "I think everybody in the industry understands that." At best, these remarks reflect participants in an overly consolidated market aligning supracompetitive fares. At worst, they may be a strategic attempt to coordinate behavior — specifically designed to encourage Wall Street to punish smaller rival airlines that have announced plans to expand capacity and cut prices.

Last month, the CEO of Southwest Airlines declared plans to expand capacity by as much as eight percent, which many in the industry viewed as a preface to cutting fares. However, as reported in the Times, "after coming under fire at this week's conference, Southwest quickly moved to reassure investors it isn't going rogue. 'We have taken steps this week to begin pulling down our second half 2015 to manage our 2015 capacity growth...,' (Southwest's CEO) said." The conclusion seems inescapable that the remarks made at the IATA conference were targeted at Southwest, and that its capitulation was the result of the "fire" aimed at the company. Given the history of collusive behavior the Antitrust Division uncovered in its review of the proposed US Airways/American Airlines merger, these coordinated comments and their ultimate result necessitate your immediate attention.

---

[30] U.S. Senator Richard Blumenthal Letter to Assistant Attorney General William Baer, June 17, 2015, http://www.blumenthal.senate.gov/imo/media/doc/20150617%20Blumenthal%20to%20DOJ%20Airline%20Coordition.pdf.

In August 2013, the Justice Department filed an antitrust lawsuit to block the proposed merger between US Airways and American Airlines. A few months later, DOJ settled that case and allowed the merger to proceed subject to a number of gate divestitures. As a result of that merger, just four major airlines now account for eighty percent of all domestic air travel.

DOJ's original complaint painted a stark picture of an extremely consolidated market, in which a few firms wield enormous market power to the detriment of consumers and competition — and in which high-level executive believe there is an unmistakable link between fluctuations in capacity and fares hikes. During the course of the Antitrust Division's review of the American Airlines/US Airways merger, your staff studied the internal analyses and the planning documents put together by both companies in considering the likely effects of the merger. During DOJ's original announcement rejecting the merger you stated, "High level executives at US Airways have talked about how consolidation allows for capacity reductions that "enable" fare increases."

In particular, DOJ's complaint provided evidence of past behavior by US Airways to punish a rival for its reducing fares; it also alleged that the merger would reduce capacity and growth across the industry; and result in increased coordinated interaction among the remaining legacy airlines.

The Complaint specifically documented the troubling history of US Airways communicating directly to a rival airline that it was upset by that airline's efforts to compete more aggressively. In 2010, senior executives at US Airways complained that competition from the rival airline was "hurting profitability" in the industry. DOJ wrote: "(S)enior management debated over email about how best to get the rival airline's attention and bring it back in line with the rest of industry…(The CEO) urged the other executives to, 'portray these guys as idiots to Wall Street and anyone who'll listen.'"

The Justice Department also correctly predicted that this kind of behavior would continue should the merger be allowed to proceed — as it ultimately was. In the original complaint, DOJ wrote, "The structure of the airline industry is already conducive to coordinated behavior … the legacy airlines closely watch the pricing moves of their competitors. When one airline 'leads' a price increase, other airlines frequently respond by following with price increases of their own."
To bring home the point, the Complaint follows, "Coordination becomes easier as the number of major airlines dwindles and their business models converge."

I agree. I therefore urge the Antitrust Division to conduct a full and thorough investigation of anticompetitive, anti-consumer conduct and misuse of market power in the airline industry, evidenced by recent pricing patterns as well as remarks made at the IATA conference. Consumers are paying sky-high fares and are trapped in an uncompetitive market with a history of collusive behavior. If you find that these comments were coordinated to punish Southwest Airlines' announcement of capacity

increases, I urge you to use all the tools at your disposal to punish this anti-competitive and anti-consumer behavior.[31]

## Government Investigation

87.     DOJ swiftly responded by launching an investigation into potentially anticompetitive conduct in the airline industry. On July 1, 2015, Associated Press reported that DOJ had sent civil investigative demands ("CIDs") to a number of airlines on June 30, 2015, demanding copies of all communications the airlines had with each other, Wall Street analysts, and major shareholders about their plans for passenger-carrying capacity, or "the undesirability of your company or any other airline increasing capacity." A spokesperson for DOJ, Emily Pierce, confirmed this report, saying DOJ was investigating "possible unlawful coordination" to limit capacity increases, thereby keeping ticket prices high.

88.     CBS News reported that Delta, American and United confirmed receiving CIDs from DOJ. Southwest confirmed receiving one as well.

89.     Also on July 1, 2015, George Jepsen, the Attorney General of the State of Connecticut, announced that his office is conducting a similar investigation into collusive activity among air carriers and had sent letters to Delta, United, American, and Southwest.

## CLASS ACTION ALLEGATIONS

90.     Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities that purchased air passenger transportation services for flights within the United States from Defendants or any predecessor, subsidiary, or affiliate thereof, at any time from January 1, 2007 to the present.

---

[31] *Id.* (emphasis added).

91.     Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

92.     While Plaintiffs do not know the exact number of the members of the Class, Plaintiffs believe there are at least hundreds of Class members located throughout the United States, making the Class so numerous and geographically dispersed that joinder of all members is impracticable.

93.     There are questions of law and fact common to all members of the Class, including, but are not limited to:

(a)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, and/or stabilize the prices of air passenger transportation services sold in the United States;

(b)     Whether Defendants and their co-conspirators violated Section 1 of the Sherman Act;

(c)     The nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     The identity of the participants of the alleged conspiracy;

(e)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(f)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the Class;

(g)     The effect of the alleged conspiracy on the prices of air passenger transportation services sold in the United States during the Class Period;

(h)    Whether Plaintiffs and the Class had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

(i)    Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the Class; and

(j)    The appropriate class-wide measure of damages for the Class.

94.    Plaintiffs are members of the Class, and Plaintiffs' claims are typical of the claims of the Class. Plaintiffs will fairly and adequately protect the interests of the Class.

95.    Plaintiffs and all members of the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for air passenger transportation services purchased directly from the Defendants and/or their co-conspirators. In addition, Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

96.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

97.    Questions of law and fact common to the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

98.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual actions would engender. The Class is readily definable and is one for which records should exist in the files of

Defendants and their co-conspirators. Prosecution as a class action will eliminate the possibility of repetitious litigation.

99.     Class treatment will also permit the adjudication of relatively small claims by many members of the Class who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

<h3 style="text-align:center">ANTICOMPETITIVE EFFECTS OF THE CONSPIRACY</h3>

100.    As a result of their unlawful conduct, Defendants succeeded in fixing, raising, maintaining, or stabilizing prices for air passenger transportation services in the United States during the Class Period.

101.    Defendants' price-fixing conspiracy had the following effects, among others:

(a)     Competition in the market for air passenger transportation services has been restrained;

(b)     Prices paid by Plaintiffs and members of the Class for air passenger transportation services were fixed, raised, maintained, and/or stabilized at artificially inflated levels in the United States;

(c)     Plaintiffs and the members of the Class who purchased air passenger transportation services have been deprived of free and open competition; and

(d)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property.

102.    By reason of the alleged violations of the antitrust laws as described herein, Plaintiffs and the Class have sustained injury to their businesses or property, having paid higher prices for air passenger transportation services than they would have paid in the absence of the

Defendants' illegal conduct, and, as a result, have suffered damages in an amount presently undetermined. This is an injury of the type that the antitrust laws were meant to punish and prevent.

## FRAUDULENT CONCEALMENT

103.    Plaintiffs and the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein no earlier than July 1, 2015, the date when news reports first disclosed that DOJ was investigating Defendants for "possible unlawful coordination" to limit capacity increases.

104.    No information in the public domain was available to Plaintiffs and members of the Class prior to the announced DOJ investigation on July 1, 2015, which revealed sufficient information to suggest that Defendants were involved in an anticompetitive conspiracy to restrain trade in the market for air passenger transportation services.

105.    Defendants' and their co-conspirators' collusive acts in furtherance of their conspiracy were inherently self-concealing and carried out in a manner that defied and precluded detection by Plaintiffs and members of the Class.

106.    Because Defendants and their co-conspirators successfully and actively concealed the existence of their conspiracy, prior to July 1, 2015, Plaintiffs and members of the Class were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for passenger airline fares.

107.    Moreover, Plaintiffs and members of the Class could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy. The conspiracy as alleged

herein was fraudulently concealed by Defendants through various means and method, including, but not limited to, secret meetings and surreptitious communications among Defendants by the use of telephone and/or in-person meetings at trade association gatherings (and elsewhere) in order to prevent the existence of written records.

108.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators until July 1, 2015, Plaintiffs and the members of the Class had no knowledge of the alleged conspiracy or of any facts or information which would have caused a reasonably diligent person to investigate whether a conspiracy existed.

109.    None of the facts or information available to Plaintiffs and members of the Class prior to July 1, 2015, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to that date.

110.    For these reasons, the statute of limitations applicable to Plaintiffs and the Class' claims alleged herein was tolled and did not begin to run until July 1, 2015.

### CAUSE OF ACTION
### (Violation of Sections 1 of the Sherman Act)

111.    Plaintiffs repeat and re-allege the allegations set forth above.

112.    Beginning at a point in time during Class Period, Defendants entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Sections 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition for air passenger transportation services in the United States.

113.    In particular, Defendants have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of airfares in the United States.

114.    As a result of Defendants' unlawful conduct, airfares were raised, fixed, maintained and stabilized in the United States.

115.    Defendants' combination or conspiracy consisted of a continuing agreement, understanding, and concerted action among Defendants.

116.    Defendants' conspiracy had the effect of artificially inflating the airfares charged in the United States.

117.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class paid more for airfares than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## RELIEF REQUESTED

Accordingly, Plaintiffs request that the Court enter judgment on its behalf and on behalf of the Class herein, adjudging and decreeing that:

A.    This action may proceed as a class action, with Plaintiffs as the designated Class representative and its counsel as Class Counsel;

B.    Defendants have engaged in combination and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and Plaintiffs and the members of the Class have been injured in their business and property as a result of Defendants' violation;

C.    Plaintiffs and the members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a judgment be entered against Defendants, jointly and severally, in favor of Plaintiffs and the Class in an amount to be trebled in accordance with such laws;

D.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein.

E.  Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.  Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.  Plaintiffs and members of the Class receive such other or further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues triable by jury.

Dated: July 31, 2015

DEAN TED and BONNIE FOSTER PATRICK and
MARK LAND and LORRIE ANN COATES

By_____
Noah Shube, Esq. (NS 1300)
THE LAW OFFICES OF NOAH SHUBE
401 Broadway, STE 2115
New York, NY 10013
212.274.8638
*Of Counsel*

Stephen E. Baril, Esq. (VSB #19604)
Paul D. Anders, Esq. (VSB #31712)
KAPLAN VOEKLER CUNNINGHAM & FRANK PLC
1401 East Cary Street
P.O. Box 2470
Richmond, Virginia 23218
Tel:  804-823-4003
Fax:  804-823-4099
sbaril@kv-legal.com
panders@kv-legal.com
*Counsel for Plaintiffs and the Proposed Class*

{00703626.1 }